FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2007 APR 20 P 1: 55

CLERK J. Burton
SO. DIST. OF GA.

LAURA E. STOCKTON,          *
                            *
        Plaintiff,          *
                            *     CIVIL ACTION NO.
    vs.                     *     CV 106-068
                            *
A WORLD OF HOPE CHILDCARE   *
LEARNING CENTER and NEW HOPE *
BAPTIST CHURCH OF HARLEM, INC. *
                            *
        Defendants.         *

---

**O R D E R**

---

In this employment discrimination case, Defendant[1] moves
for summary judgment on Plaintiff's claims brought pursuant to
the Americans with Disabilities Act (the "ADA"), 29 U.S.C. §§
12101 et seq. Upon consideration of the parties' briefs, the
record evidence, and the relevant law, the summary judgment
motion is **GRANTED** for the reasons stated below.

## I.  BACKGROUND

Plaintiff Laura Stockton is twenty-six years old and has
attained a degree in secondary education. (Pl.'s Dep. at 4-
5.) When she was an infant, Plaintiff had an allergic

---

[1]  A World of Hope Childcare Learning Center is not a
separate entity but is operated by New Hope Baptist Church of
Harlem, Inc. Thus, there is only one defendant in the case.

reaction to a "DPT vaccination," which caused her to develop problems in her leg muscles, specifically muscle spasticity. (Id. at 6-7.) Notably, Plaintiff has difficulty with her balance and her stride. She walks with a limp and must take small steps because of her unsteady gait. Plaintiff is generally unable to move quickly enough to regain her stability if she becomes unbalanced. (Apostol Dep. at 11-12.)

In the summer of 2004, Plaintiff applied for a part-time position with Defendant A World of Hope Childcare Learning Center (hereinafter "A World of Hope"). Plaintiff was interviewed by Ms. Carolyn Swain and Ms. Linda Collins, the Director and Assistant Director, respectively, of A World of Hope. (Swain Dep. at 9, 15; Collins Dep. at 5, 9.) Upon their recommendation, Plaintiff was hired by Ms. Yvonne Reid Sidbury, the Administrator of A World of Hope. (Sidbury Dep. at 30-31.) Plaintiff was hired to work from 2:00 to 6:00 p.m. as a teacher in the after-school program.[2] (Pl.'s Dep. at 13-14.) At the time of the interview, Ms. Swain and Ms. Collins noticed that Plaintiff walked with a limp (Collins Dep. at 10; Swain Dep. at 15), but Plaintiff told them that she was able

_____

[2] Ms. Collins thought Plaintiff's original hours were from 3:00 to 6:00 p.m. (Collins Dep. at 11), and Ms. Swain thought they were from 4:00 to 6:00 p.m. (Swain Dep. at 14-15). All agree that Plaintiff was hired as a teacher in the after-school program. (Pl.'s Dep. at 13-14; Collins Dep. at 11; Swain Dep. at 14-15; Sidbury Dep. at 30-31.)

to perform all the work as they had described it to her (Collins Dep. at 10-12). Plaintiff indicated no physical limitations on her application for employment. (Sidbury Dep. at 37.)

In Plaintiff's first days of work, she worked with the pre-K children (generally four-year-olds) from 2:00 to 4:00 p.m. and then with the after-school program (generally five-year-olds and above) from 4:00 to 6:00 p.m. (Pl.'s Dep. at 14-15.) In addition to teaching, Plaintiff's responsibilities in these rooms included mopping, wiping down toys and tables, cleaning a bathroom, and vacuuming. Plaintiff testified that she had no problems with any of these duties in the beginning except that she could not carry the vacuum cleaner on her back. (Id. at 16.) The only other difficulty encountered by Plaintiff is that she required a chair on playground duty so that she could sit for part of the time. (Id. at 17.)

Within days of her start date, Plaintiff began to work additional hours to provide lunch relief to employees in the toddler room. Plaintiff typically worked from 11:00 a.m. to 6:00 p.m., spending the first few hours in the toddler room and then going into the pre-K or after-school program in the afternoons. (Id. at 19-20.) It is not clear who initiated the idea of working additional hours, but Plaintiff welcomed the added income. (See id. at 19.) Plaintiff's

responsibilities in the toddler room included helping the toddlers with their lunch, taking them to the bathroom, and putting them on mats for their naps. (<u>Id.</u> at 19-20.)

During the initial months, there was no indication to anyone in Plaintiff's supervisory chain of command that she had any problem performing her duties as assigned. (Sidbury Dep. at 38.) Indeed, Plaintiff testified that she did not have any problems in performing her job until January of 2005. (Pl.'s Dep. at 20.) At that time, enrollment had increased to a point that Plaintiff began looking after children who were not potty-trained, and she was expected to lift these children onto the changing table. (<u>Id.</u> at 20-21.) Plaintiff testified that Ms. Swain told her it was only fair if everyone changed the children rather than asking other employees to do this task for her. (<u>Id.</u> at 22.) In response, Plaintiff acquiesced and performed the changing duties until she was no longer in the toddler room.[3] (<u>Id.</u> at 22-23.)

---

[3] The relevant testimony is as follows:

Q: Now, how long did you work under this arrangement where these other people were doing these changing activities?

A: Only a few days before Ms. Swain came in and said that that's not how we would do it, we would all rotate and take turns changing the children.

Q: And what did you say to her when she told you that?

4

At some point in January, Plaintiff complained for the first time to Ms. Sidbury about her duties in the toddler room. (Pl.'s Dep. at 23-25.) Specifically, Plaintiff complained that Ms. Swain was pulling her out of the pre-K room and assigning her to the toddler room after 2:00 p.m. Ms. Swain was brought into the meeting. (Id. at 25.) Plaintiff understood that their conversation would result in Ms. Swain refraining from putting her in the toddler room after 2:00 p.m. (id. at 27-28), but Ms. Swain and Plaintiff would clash on this issue at times after the meeting (id. at 28-30).

Ms. Sidbury recalled, however, that Plaintiff began to complain to her in November. At that time, Plaintiff approached Ms. Sidbury to complain that Ms. Swain was making

---

A: I said that we had talked about this, and she said she didn't recall talking about it and that it was only fair if everybody changed the children.

Q: And what did you say, if anything, in response to that?

A: I said, okay.

Q: And did you do that for a while?

A: I did.

Q: For how long?

A: Until I was not - - no longer in that room.

(Pl.'s Dep. at 22-23.) Plaintiff was permanently removed from the toddler room on March 15, 2005. (Id. at 34, 37.)

an issue of Plaintiff having asked her co-workers to help her lift the center's television on and off a cart and lift the mop water bucket to empty it.[4] (Sidbury Dep. at 38-39.) Plaintiff also complained to Ms. Sidbury that Ms. Swain picked on her by moving her around more than others. (Id. at 47-48.) Specifically, Plaintiff complained that Ms. Swain removed her too often from her afternoon duties with the pre-K and after-school program and placed her in the toddler room. Plaintiff explained to Ms. Sidbury that she expected not to be pulled out of these programs after 2:00 p.m. Ms. Sidbury testified that she counseled Ms. Swain to be more lenient and accommodating by letting other employees help Plaintiff where needed. (Id. at 45-46.)

According to Ms. Sidbury, Plaintiff asked for a meeting with her and the pastor of the church in January of 2005 in regard to Ms. Swain's behavior toward her. (Id. at 49.) Rather than meet with Plaintiff, Ms. Sidbury claims that she and the pastor met with Ms. Swain and instructed her not to let lifting the mop bucket and television be issues with Plaintiff's employment and to let other employees help her with these duties. Ms. Swain was also told to let Plaintiff teach her classes with minimal interruption. (Id. at 50-51.)

---

[4] Apparently, Plaintiff injured her back in October of 2004 and was unable to lift and dump the water from the mop bucket after cleaning. (Apostol Dep. at 16-18.)

According to Plaintiff, the relationship between her and Ms. Swain "calmed down" through February. (Pl.'s Dep. at 31.) On March 7, 2005, however, Ms. Sidbury conducted an employee meeting in which she stated that all employees must perform all jobs in the center or they could quit.[5] (Id.) While Ms. Sidbury's comment was directed to all employees, Plaintiff admittedly took offense to the comment. (Id. at 32-33.) Plaintiff then called an organization concerned with the ADA that she had located on the internet, and she then prepared a letter, dated March 8, 2005, in which she explained her physical limitations to A World of Hope. (Id. at 33-34.) Prior to giving the letter to A World of Hope, she visited her doctor to have him review the March 8, 2005 letter and asked him to write a supporting letter. (Apostol Dep. at 18-22.)

On March 14, 2005, Plaintiff turned in her March 8, 2005 letter (along with the doctor's letter dated March 9, 2005). (Pl.'s Dep. at 34.) Plaintiff's March 8, 2005 letter states in pertinent part:

> After certain comments made by management [in] the staff meeting on March 7, 2005, I feel it necessary to request in writing any and all reasonable accommodations that I may require at this time. . . .

---

[5] Ms. Sidbury claims that she said all employees needed to pull their weight and perform all duties assigned. (Sidbury Dep. at 59.)

3.  Due to my disability I have back problems and when I lift heavy things this causes pain or injury . . . . My lifting restrictions are but may not be limited to the following: lifting toddlers, older infants and certainly older children (especially lifting on (sic) toddlers one after another to place them on the changing table or to carry them where they need to be); lifting older and heavier infants from a crib or out of a swing; lifting on (sic) the mop bucket in order to properly dump the water; lifting or carrying the current vacuum cleaner at all; lifting the television to either get it out or put it away; moving shelves or cubbies either to clean behind them or to place them in another part of a room . . . .

4.  Due to by disability I have poor balance which may restrict me or in some cases place myself and/or children in dangerous positions in certain situations. The following are known restrictions . . . : walking in the toddler room especially when they are not sitting at the tables for lunch or on their mats for nap . . . they may run or walk in front of me without me having sufficient time to not trip and or fall as well as it is common for this age group to grab hold of adults as they walk by and I may not be steady enough to keep my balance under such circumstances; I cannot stand for long lengths of time without support or assistance - this may mean that at some point while out on the playground I will require being able to sit down somewhere on the playground and/or lean against the building for a while; I cannot easily walk on uneven surfaces without the increased likelihood of a fall - this means that I cannot stand or walk in the sand portion of the playgrounds for any length of time (though in an emergency I am able to walk to a child if needed); I cannot easily pick up any infant from a crib as this throws off my balance . . . .

5.  I am not physically able to run. This means I cannot run after younger children if they are running from me or another adult for whatever reason . . . .

8

(Def.'s Mot. for Summ. J., Ex. D.)

Ms. Sidbury and Ms. Swain telephoned Plaintiff the morning after they received the letter. Plaintiff was immediately told that her hours were cut in that she would no longer be working in the toddler or infant rooms. (Pl.'s Dep. at 37.) Plaintiff was thereafter to work from 2:30 to 6:00 p.m. with the pre-K and after-school programs - the job she was initially hired to perform. (Id. at 37-38.) According to Plaintiff, she did not expect for her hours to be cut; she had instead meant the letter to open a dialogue about reasonable accommodations. (Id. at 37.)

Ms. Sidbury testified that the letter caused her great concern about the safety of the children. (Sidbury Dep. at 55-57.) She stated that in her telephone conversation with Plaintiff, she was told that Plaintiff did not feel comfortable in the toddler room. (Id. at 63-67.) Ms. Sidbury explained that she had to cut her hours because there was no possibility of reassignment during the lunchtime hours. (Id. at 64.)

Plaintiff continued to work at A World of Hope through May 12, 2005, at which time she resigned. (Pl.'s Dep. at 42.) Plaintiff testified that Ms. Swain continued to harass her about her lifting limitations, specifically the mop bucket, the television, and the vacuum cleaner, throughout this time.

(Id. 45-48.)  Plaintiff claims that she tired of the constant harassment.  (Id. at 53-54.)

Plaintiff initially filed this case in the Superior Court of Columbia County, alleging that she was discriminated against, and ultimately constructively discharged, because A World of Hope did not want to continue to make reasonable accommodations for her disability.  (Compl. ¶ 17.)  Plaintiff also complains of a hostile work environment.  (Id. ¶ 12.) The case was removed to this Court on May 16, 2006.  Defendant has filed a motion for summary judgment on Plaintiff's ADA claims of discrimination and constructive discharge.

## II.  SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor," United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991)

(en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). If the movant bears the burden of proof at trial, that party "must show that, on all the essential elements of its case, . . . no reasonable jury could find for the non-moving party." Four Parcels, 941 F.2d at 1438. On the other hand, if the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways--by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement

that the non-movant cannot meet the burden at trial is insufficient. <u>Clark</u>, 929 F.2d at 608.

If--and only if--the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." <u>Id.</u> Again, how to carry this burden depends on who bears the burden of proof at trial. If the <u>movant</u> has the burden of proof at trial, the non-movant may avoid summary judgment only by coming forward with evidence from which a reasonable jury could find in its favor. <u>Anderson</u>, 477 U.S. at 249. If the <u>non-movant</u> bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carries its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." <u>Fitzpatrick</u>, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." <u>Id.</u> at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by

repeating conclusory allegations contained in the complaint. See <u>Morris v. Ross</u>, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond by affidavits or as otherwise provided by Rule 56.

The Clerk has given the non-moving party notice of the summary judgment motion and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default. (Doc. No. 12.) Therefore, the notice requirements of <u>Griffith v. Wainwright</u>, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is ripe for consideration.


### III.  ANALYSIS

Defendant moves for summary judgment on Plaintiff's claims under the ADA. The ADA protects "qualified individual[s] with a disability" from discrimination. 29 U.S.C. § 12112(a). The ADA's prohibition on discrimination includes an employer's failure to make reasonable accommodations for a qualified individual's disabilities. In this case, Plaintiff claims that A World of Hope failed to provide reasonable accommodations for her disability. She also claims that it constructively discharged her because of

her disability. For the following reasons, both claims necessarily fail.

## A. Discrimination Claim

In order to establish a prima facie case of discrimination, a plaintiff must show that (1) she has a disability; (2) she was a qualified individual; and (3) she was discriminated against because of her disability. Carruthers v. BSA Advertising, Inc., 357 F.3d 1213, 1215 (11th Cir. 2004); Gordon v. E.L. Hamm & Assoc., 100 F.3d 907, 910 (11th Cir. 1996). Defendant contends, inter alia, that Plaintiff cannot establish a prima facie case of discrimination under the ADA because she is not disabled for purposes of the statute.

In this case, Plaintiff suffers from the after-effects of an allergic reaction to a childhood vaccination. Plaintiff has certain physical impairments such as difficulties in her balance and her stride. Plaintiff also has an unsteady gait and poor reflexes. Finally, she has trouble lifting certain objects and weight, especially if it will cause her to become imbalanced. A physical impairment alone, however, is not necessarily a disability under the ADA. Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1226 (11th Cir. 1999). In order for any ADA claim to succeed, a plaintiff must show that her impairments rise to the level of a disability.

Under the ADA, an individual has a disability if she: 1) has a physical or mental impairment that substantially limits one or more of her major life activities; 2) has a record of such an impairment; or 3) is regarded as having such an impairment. 29 U.S.C. § 12102(2)(A)-(C). In this case, Plaintiff asserts she is disabled under the first and third prongs.

Under the first definition of a disability, an individual is considered to have a disability if she has a physical or mental impairment that substantially limits a major life activity. The major life activities enumerated by an EEOC regulation are "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). According to the EEOC regulations, "substantially limited" means "[s]ignificantly restricted as to the condition, manner or duration under which [the] individual can perform [the] particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity." Id. § 1630.2(j)(1)(ii). Plaintiff must do more than show some minor limitation in a major life activity – the term "substantially limits" must be interpreted strictly to create a "demanding standard" for

qualifying as disabled under the ADA. <u>Toyota Motor Mfg. v.</u>
<u>Williams</u>, 534 U.S. 184, 197 (2002).

In this case, Plaintiff claims that she is substantially
limited in her ability to work. A person is substantially
limited in the major life activity of working if she is
"significantly restricted in the ability to perform either a
class of jobs or a broad range of jobs in various classes as
compared to the average person having comparable training,
skills, and abilities." 29 C.F.R. § 1630.2(j)(3)(I); <u>see</u>
<u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471, 492 (1999)
("To be substantially limited in the major life activity of
working . . . then, one must be precluded from more than one
type of job, a specialized job, or a particular job of
choice."); <u>Standard v. A.B.E.L. Servs., Inc.</u>, 161 F.3d 1318,
1327 (11th Cir. 1998). As other circuit courts have explained,
a person's expertise, background, and job expectations are
relevant factors in defining the class of jobs used to
determine whether an individual is disabled. <u>Webb v. Garelick</u>
<u>Mfg. Co.</u>, 94 F.3d 484, 487-88 (8th Cir. 1996); <u>see</u> <u>Mondzelewski</u>
<u>v. Pathmark Stores, Inc.</u>, 162 F.3d 778, 784 (3d Cir. 1998);
<u>Jasany v. United States Postal Serv.</u>, 755 F.2d 1244, 1249 (6th
Cir. 1985). Thus, a court must individually assess whether a
"particular impairment constitutes for the particular person
a significant barrier to employment." <u>Webb</u>, 94 F.3d at 488

16

(quoting <u>Forrisi v. Bowen</u>, 794 F.2d 931, 933 (4th Cir. 1986)).

In this case, Plaintiff cannot meet this demanding standard because she has not shown that her condition substantially limited her ability to "work." Indeed, in the early months of her employment, Plaintiff was able to perform almost all duties as assigned, even in the toddler and infant rooms. She even performed the most demanding task of lifting the toddlers to the changing table until she was taken out of the toddler room. <u>See</u> note 3 <u>supra</u>. Remarkably, it seems that Plaintiff only had the most trouble in the toddler room after 2:00 p.m., the time within which she expected to be in the pre-K or after-school programs with minimal interruption.[6] Her subsequent exclusion from the toddler and infant room did not present a significant barrier to her employment at A World of Hope, or any other daycare center for that matter. It is

_____

[6] The relevant deposition testimony of Plaintiff reads as follows:

Q: So, basically, from maybe about your third day until the day you turned in that [March 8th] letter, you were doing some work in the - - in the room with these small children from 11:00 till what time?

A: It changed. Sometimes it was from 11:00 to 1:00, sometimes 11:00 to 2:00. When I spoke to Ms. Sidbury [in January], it was because I was then kept in there after - - sometimes after 2:00 o'clock, and that's when I began to have the most trouble with lifting the children.

(Pl.'s Dep. at 23-24.)

undisputed that Plaintiff continued to perform her duties as an after-school program teacher, the job for which she had been originally hired.

Plaintiff's only limitations in performing this work involved some of the lifting required for cleaning. Plaintiff has not submitted any evidence that these lifting issues significantly restricted her ability to work either a class of jobs or a broad range of jobs in various classes. In other words, Plaintiff does not contend that she could not perform the tasks of teaching but simply that she could not perform certain aspects of the cleaning duties without some assistance. Further, the task of "lifting" is not among the EEOC's enumerated list of major life activities. The Eleventh Circuit has looked unfavorably on a plaintiff's arguments that a lifting restriction constitutes a disability. See Hilburn, 181 F.3d at 1228 (affirming trial court's decision that a ten-pound lifting restriction does not establish that the plaintiff was substantially limited in the major life activity of working); Chanda v. Engelhard/ICC, 234 F.3d 1219, 1222 (11th Cir. 2000) (reiterating the holding in Hilburn that a diminished activity tolerance for normal daily activities such as lifting, running and performing manual tasks, as well as a lifting restriction, did not constitute a disability under the ADA).

In sum, Plaintiff is not limited in her ability to perform a broad class of jobs, specifically teaching, because of her impairments. While Plaintiff may not be able to perform some of the manual cleaning tasks expected of her at A World of Hope, she is in no way limited in her ability to perform the essential functions of a teaching or educational job which does not require similar cleaning tasks. Thus, even if she is unable to perform the essential functions of the teaching position at A World of Hope, this does not require a finding that she is disabled because she is not excluded from the broad class of jobs within her training, expertise, and job expectations. See 29 C.F.R. § 1630.2(j)(3)(I) ("The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.").

Plaintiff also argues that she is disabled for purposes of the ADA because she was "regarded as" disabled by A World of Hope. Under the "regarded as" prong, a person is regarded as disabled if the employer "mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 521-22 (1999). To put it another way, as with actual impairments, a perceived impairment must

be one that, if real, would substantially limit a major life activity. <u>Carruthers</u>, 357 F.3d at 1216.

In the instant case, Plaintiff has the burden on summary judgment to demonstrate a question of fact as to whether A World of Hope regarded her as substantially limited in her ability to work. That is, Plaintiff must show A World of Hope perceived her as "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." <u>See</u> 29 C.F.R. § 1630.2(j)(3)(I). Mere knowledge of an employee's physical impairments and the restrictions imposed by such impairments is not sufficient to show the employer regarded the employee as disabled. <u>See</u> Carruthers, 357 F.3d at 1217.

As evidence of her claim, Plaintiff points to the fact that she was taken out of the toddler and infant room. She also points to the fact that A World of Hope knew that she had physical impairments and that she particularly needed assistance with some of the cleaning tasks. This evidence, alone or taken as a whole, is insufficient to show A World of Hope perceived Plaintiff as significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. At most,

this evidence shows A World of Hope was aware of Plaintiff's lifting restrictions and that she was unable to work with toddlers. Indeed, the evidence shows that A World of Hope considered Plaintiff able to perform the job that she was originally hired to perform - that of teaching the pre-K and after-school programs. In fact, she performed that job from the time that her hours were cut on March 15 until she resigned on May 14, 2005.

In conclusion, Plaintiff's failure to present sufficient evidence from which a reasonable juror could conclude that she had a disability or was regarded as disabled by A World of Hope is fatal to her claims under the ADA. Summary judgment is therefore appropriate on Plaintiff's ADA claims.

Even assuming that Plaintiff could show she had a disability, Plaintiff cannot show she is a qualified individual under the ADA. An individual is qualified if she is able to perform the "essential functions" of the job with or without reasonable accommodation. D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1226 (11th Cir. 2005).

Plaintiff unequivocally states in her letter of March 8, 2005, that she could not perform the essential job functions of working in the infant and toddler room without reasonable accommodation. That is, she admits that she could not lift a child in and out of a crib or a swing, she could not lift a

child to the changing table, and she could not lift to help in the cleaning of these rooms.  Also, Plaintiff admits that her poor balance may endanger the children in the toddler room.

The issue then is whether Plaintiff could perform these essential functions of the job *with* reasonable accommodation. The burden falls to Plaintiff to identify a reasonable accommodation that would have permitted her to perform the essential functions of care giver in the infant and toddler rooms.  See Earl v. Mervyns, Inc., 207 F.3d 1361, 1367 (11th Cir. 2000) ("The burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of her job rests with that employee . . . ."); Tubbs v. Formica Corp., 107 Fed. Appx. 485, 488 (6th Cir. 2004) ("A disabled employee who claims that he or she is otherwise qualified with a reasonable accommodation bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable."); Willis v. Conopco, Inc., 108 F.2d 282 (5th Cir. 1997).  While Plaintiff suggests in her March 8, 2005 letter that she is writing to request reasonable accommodations, she never describes what those reasonable accommodations might be.  Indeed, Plaintiff admits that the letter was meant to be the catalyst to discuss

reasonable accommodations with her employer.[7] Yet, Plaintiff never identified any reasonable accommodation that could be made to allow her to work in the infant and toddler rooms.[8]

In response, Plaintiff points out that prior to the March 8, 2005 letter, she was reasonably accommodated in those rooms in that other employees performed the lifting duties for her. Plaintiff thus argues that rather than remove her from those rooms, A World of Hope should have simply allowed her to continue while making the same accommodations it had previously. However, the ADA does not require an employer "to reallocate essential job functions." Holbrook v. City of Alpharetta, Ga., 112 F.3d 1522, 1527 (11th Cir. 1997) (quotation omitted); see also Epps v. City of Pine Lawn, 353 F.3d 588, 593 n.5 (8th Cir. 2003) ("An employer is not required to hire additional people or assign tasks to other employees to reallocate essential functions that an employee

---

[7] Plaintiff testified: "In my letter, I tried to think of anything and everything I might not be able to do, because it was my understanding from the ADA that I needed to list this and then we would talk about it, and each side would be reasonable in coming up with how I should be accommodated." (Pl.'s Dep. at 38.)

[8] When asked whether Plaintiff ever approached Ms. Sidbury after her hours were cut to ask if they could discuss reasonable accommodations, Plaintiff admitted that she did not. She testified: "Ms. Sidbury's tone pretty much made it clear, at least in my mind, that we were not going to be able to discuss this any further. . . . I didn't know what to do, so I didn't try other than to just go with what we did have." (Pl.'s Dep. at 43-44.)

must perform."). Moreover, the fact that an employer provided past accommodations which exceed what the law requires does not compel that employer to continue to provide the accommodations. See Holbrook, 112 F.3d at 1528 (stating that when an employer's past accommodations have "exceeded that which the law requires," a "decision to cease making those accommodations that pertained to the essential functions" of the job does not violate the ADA"); Wood v. Green, 323 F.3d 1309, 1314 (11th Cir. 2003) (The existence of "prior accommodations do[es] not make an accommodation reasonable.") Thus, any demand to have other employees perform the essential functions of care giver in the infant and toddler rooms would be unreasonable.[9]   Without any other suggestion of how Plaintiff could have performed the essential functions of this position, no reasonable jury could determine that she was qualified under the ADA.  Thus, A World of Hope is entitled to summary judgment on this ground as well.

### B.    CONSTRUCTIVE DISCHARGE

Plaintiff also claims that she was constructively discharged in violation of the ADA based upon the alleged harassment she encountered from Ms. Swain during her

_____

[9]    The Court further notes that Plaintiff's suggestion for reasonable accommodation, i.e., to have other employee's perform certain lifting tasks, in no way addresses the child endangerment issue raised by Plaintiff in the March 8, 2005, letter.

employment because of her disability. As explained above, however, Plaintiff is not a member of a protected class, i.e., she is not considered disabled for purposes of the ADA. See Fox v. General Motors Corp., 247 F.3d 169, 176-77 (4th Cir. 2001) (modifying the parallel Title VII methodology in setting forth the elements of a hostile work environment claim under the ADA); Johnston v. Henderson, 144 F. Supp. 2d 1341, 1360-61 (S.D. Fla. 2001). Accordingly, any claim for constructive discharge under the ADA must fail.

## IV. CONCLUSION

Upon the foregoing, Defendant's motion for summary judgment (doc. no. 10) is **GRANTED.** The Clerk is directed to **ENTER FINAL JUDGMENT** in favor of Defendant and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this _2⁰_ day of April, 2007.

---
HONORABLE LISA GODBEY WOOD
UNITED STATES DISTRICT JUDGE